UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | No. 3:20-CR-00337-X-2 |
| JUAN JOSE CAMACHO | § | |

**MEMORANDUM OPINION AND ORDER**

The United States has charged the defendant, Juan Jose Camacho, with various drug and firearm crimes. Before the Court are three motions from Camacho: a motion to suppress [Doc. No. 59], a motion to obtain [Doc. No. 60], and a motion to prohibit [Doc. No. 61]. The Court **GRANTS IN PART** and **DENIES IN PART** the motion to suppress, **GRANTS IN PART** and **DENIES IN PART** the motion to obtain, and **GRANTS** the motion to prohibit.

**I.    Factual Background**

On June 23, 2020, Drug Enforcement Administration (DEA) officers were surveilling an apartment that a suspected drug dealer was using. A convicted drug dealer was known to have used the apartment as a drug-storage-and-selling location. The DEA had received a tip from a confidential, civilian source that a drug

transaction involving three to five kilograms of methamphetamine was to occur at the apartment that day.[1]

The DEA officers observed the defendant, Camacho, arrive in a car. Camacho exited the car carrying what appeared to be an empty black backpack and entered the apartment. Several minutes later, the DEA officers observed Camacho exit the apartment with the suspected drug dealer, carrying the same black backpack—except now the backpack appeared to be weighed down with items. Camacho placed the backpack in the car's trunk and drove away.

The DEA officers contacted uniformed Dallas Police Department officers who were waiting near the apartment and who had been previously informed that the DEA officers might need their assistance. The DEA officers followed Camacho while they relayed to the Dallas officers Camacho's location and requested that the Dallas officers assist with stopping Camacho's car. While following Camacho, the DEA officers relayed to the Dallas officers that they had observed Camacho commit at least one traffic violation.[2]

But before the Dallas officers were able to execute a traffic stop, the DEA officers observed Camacho pull into a motel parking lot, park his car, and walk toward the motel. About that time, the Dallas officers arrived at the scene and, under the

---

[1] Suppression Hearing Transcript, Doc. No. 96 at 34:21–24.

[2] The traffic violations were un-signaled lane changes. *Id.* at 50:21–23.

2

DEA officers' directions, approached Camacho and placed him in handcuffs on a curb near his car.

Approximately five to ten minutes later,[3] a DEA canine handler arrived on the scene with his drug-detection canine. The officer had also been waiting nearby the apartment and was receiving Camacho's traveling directions via the radio. The officer directed the canine as it conducted a free-air sniff of the exterior of Camacho's car. The canine alerted to the back left area of the car, indicating the presence of narcotics.

The officer then approached Camacho and told him that the canine had alerted for narcotics and that there was probable cause to search the vehicle. The officer asked Camacho if narcotics were in the car. Camacho denied the presence of narcotics. Camacho then allowed the officer to remove Camacho's car keys from his back pocket. The officer walked towards Camacho's car. Then, a Dallas officer asked Camacho again whether narcotics were in the car. This time, Camacho admitted that

---

[3] *Id.* at 121:11–18. *See also* Doc. No. 66 at 3, 11.

methamphetamine was in the trunk. The Dallas officer asked how much methamphetamine was present in the car, and Camacho refused to answer.

The officers then searched Camacho's car and found the black backpack in the trunk, inside of which were three kilograms of suspected, and later confirmed, methamphetamine. The officers arrested Camacho.

## II.     Motion to Suppress

Camacho contends that the officers violated his Fourth Amendment right against unreasonable searches and seizures. He moves to suppress all of his statements to officers on the day of the search, all items seized from him and his car, and all testimony of officers after his arrest. Doc. No. 59 at 1–2. The government argues in response that the officers complied with the Fourth Amendment because they had (1) reasonable suspicion to stop Camacho in the motel parking lot and conduct a dog sniff and (2) probable cause to search the back of his car. Doc. No. 66 at 4–5.

The Fourth Amendment to the Constitution ensures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Generally, warrantless searches and

seizures are considered unreasonable, subject to "specifically established and well-delineated exceptions."[4]

One of those exceptions is when an officer has "reasonable suspicion that illegal activity has or is taking place."[5] If an officer has the requisite reasonable suspicion, he may stop the suspect.[6] When an officer stops a suspect in a vehicle, the "stop complies with the Fourth Amendment if it is justified at inception and [the] officers' conduct during the stop is reasonably related in scope and duration to the circumstances justifying the detention."[7] Courts examine the totality of the circumstances in deciding whether an officer had reasonable suspicion. *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006).

Where, as here, the reasonableness of an officer's suspicion rests on a tip, courts analyze the totality of the circumstances including

> the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by officers in the field,

---

[4] *Katz v. United States*, 389 U.S. 347, 357 (1967).

[5] *United States v. Rodriguez*, 564 F.3d 735, 741 (5th Cir. 2009) (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

[6] *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013); *see also Rodriguez v. United States*, 575 U.S. 348, 354 (2015).

[7] *United States v. Escamilla*, 852 F.3d 474, 480 (5th Cir. 2017).

and whether the tip or report concerns active or recent activity, or has instead gone stale.[8]

The Supreme Court has held that even an anonymous 911 call reporting a traffic violation can provide reasonable suspicion for the officer to stop the car—as long as the call has a sufficient "indicia of reliability."[9]

Here, the first question is whether the Dallas officers had reasonable suspicion to stop Camacho as he walked away from his car at the motel parking lot. The Court finds that the answer is yes. Having observed Camacho commit a traffic violation, "the circumstances, viewed objectively, would have justified" the DEA officers pulling over Camacho.[10] The Fifth Circuit has held that a "traffic violation provides officers with authority for an investigative stop."[11]

Under the collective knowledge doctrine, reasonable suspicion can transfer from officers with knowledge of the facts supporting reasonable suspicion to officers who actually stop the suspect—as long as the officers are communicating.[12] So, when the DEA officers tipped the Dallas officers that they had seen Camacho commit a traffic violation, the reasonable suspicion possessed by the DEA officers then vested to the Dallas officers under the collective knowledge doctrine.[13] In other words, the

---

[8] *United States v. Martinez*, 486 F.3d 855, 861 (5th Cir. 2007).

[9] *Navarette v. California*, 572 U.S. 393, 404 (2014).

[10] *Whren v. United States*, 517 U.S. 806, 813 (1996) (cleaned up).

[11] *United States v. Castillo*, 804 F.3d 361, 364 (5th Cir. 2015).

[12] *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007).

[13] The Dallas officers had an additional basis for reasonable suspicion to stop Camacho and conduct a dog sniff: that Camacho was suspected of a drug crime. The DEA officers reasonably suspected drug-related criminal activity based on the confidential, specific tip that a purchase would happen at the apartment that day; the apartment was a known drug-storage-and-selling location that

reasonable suspicion transferred from the officers who had knowledge of the necessary facts (the DEA officers) to the acting officers (the Dallas officers).

Moreover, the source of the tip was credible and reliable—as the source was the DEA officers; the specificity was sufficient—as the DEA officers relayed a description of Camacho's car and his license plate information to the Dallas officers; and the criminal activity was far from "stale." Even if the officers' "ulterior motive" was to catch Camacho for a suspected drug crime, that did not "strip them of their legal justification" for the traffic stop.[14]

The second question is whether the DEA canine handler had reasonable suspicion to conduct a dog sniff of Camacho's car. The Court again finds that the answer is yes. A "dog sniff is not a search" requiring reasonable suspicion above that which justifies the initial stop.[15] So, because Camacho was already lawfully stopped, the dog sniff was justified because it did not "prolong beyond the time reasonable required to complete the mission."[16] Even if the dog sniff prolonged the stop more

---

had been used previously by a convicted drug dealer; a suspected drug dealer occupied the apartment; and Camacho entered the apartment with an apparently empty backpack and exited with the backpack weighed down and accompanied by the suspected drug dealer. This is enough to establish reasonable suspicion. *See Rodriguez*, 564 F.3d at 741 ("Reasonable suspicion requires more than merely an unparticularized hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence." (cleaned up)). And, under the collective knowledge doctrine, that reasonable suspicion vested to the Dallas officers because they had communicated with the DEA officers about the potential drug purchase in addition to the traffic violations. *Ibarra*, 493 F.3d at 530; Suppression Hearing Transcript, Doc. No. 96 at 62:21–63:8.

[14] *Whren*, 517 U.S. at 812 (cleaned up).

[15] *United States v. Seals*, 987 F.2d 1102, 1106 (5th Cir. 1993) (cleaned up); *see also United States v. Rodriguez-Flores*, 249 F. App'x 317, 322 (5th Cir. 2007) ("[A] dog sniff is itself not a search within the meaning of the Fourth Amendment." (citing *Seals*, 987 F.2d at 1106)); *Illinois v. Caballes*, 543 U.S. 405, 409 (2005) (holding that dog sniff was justified by reasonable suspicion because it "was performed on the exterior of [defendant's] car while he was lawfully seized for a traffic violation").

[16] *Caballes*, 543 U.S. at 407 (cleaned up).

than necessary to investigate the traffic violation alone, that delay was justified by the reasonable suspicion that Camacho had also committed a drug crime. Simply put, the officers' actions were reasonable in scope and duration to the circumstances justifying the stop.[17]

The third question is whether the officers had probable cause to search Camacho's trunk. Again, the answer is yes. The Fifth Circuit has "repeatedly affirmed that an alert by a drug-detecting dog provides probable cause to search."[18] So, when the dog alerted for drugs in Camacho's car, the officers had the constitutional green light to search it.

The fourth and final question is whether Camacho's statements to the officers, particularly his confession to drugs being in his trunk, should be suppressed because the officers had not yet read Camacho his *Miranda* rights. In deciding whether a defendant was in custody, the lodestar is whether a reasonable person in those circumstances would have felt that he was free to leave.[19] Key factors include the length of the questioning, the location of the questioning, the accusatory or non-accusatory nature of the questioning, the amount of restraint, and statements made by the officers about the defendant's freedom to move or leave.[20]

Here, Camacho was "in custody" and therefore was due a reading of his *Miranda* rights before he confessed to the officers that drugs were in his trunk. The

---

[17] *Escamilla*, 852 F.3d at 480.

[18] *United States v. Sanchez-Pena*, 336 F.3d 431, 444 (5th Cir. 2003).

[19] *United States v. Wright*, 777 F.3d 769, 774–75 (5th Cir. 2015).

[20] *Id.* at 775.

quantity of the factors weighs in favor of a custody finding. Although the questioning was brief and in a public place, the questions were accusatory (the officers asked Camacho if drugs were in the car),[21] Camacho was restrained by handcuffs, and the officers never told Camacho that he was free to leave.[22] On balance, the Court concludes that a reasonable person in these circumstances would not have felt free to leave.

Although the Court suppresses Camacho's *statement* that drugs were in the trunk, the Court does not suppress the actual drugs seized from Camacho's trunk—because the dog sniff provided probable cause for that search. The Court also does not suppress any testimony by officers after Camacho's arrest.

### III. Motion to Obtain

Camacho moves the Court to order the government to produce various materials. The government responded that it is aware of its discovery obligations and will comply with all pertinent rules and procedures.

### A. Witness Statements

Camacho requests the statements of witnesses to be called by the United States. The Court **GRANTS** this request to the extent required by the Jencks Act, 18 U.S.C. § 3500, pursuant to which the government must disclose witness statements after the witness has been called and has testified. To the extent that Camacho wants these materials before trial, the Court **DENIES** his request—unless

---

[21] Doc. No. 66 at 3.

[22] Suppression Hearing Transcript, Doc. No. 96 at 84:7–12.

the materials also qualify as exculpatory *Brady* material. The government must turn over any witness statements that are also *Brady* material to Camacho at least ten days prior to trial.

### B.     Grand Jury Testimony

Camacho requests a transcript of grand jury testimony of any witness to be called by the United States. Before trial, a defendant can acquire grand jury testimony only by demonstrating a compelling necessity. *See In re Grand Jury Testimony*, 832 F.2d 60, 62 (5th Cir. 1987) (outlining three-part, stringent test). Camacho has not met his burden and the Court **DENIES** his request for grand jury testimony.

### C.     Materials Used During Direct Examination

Camacho requests "[a]ny document, object, photo or chart, the contents of which have in any way been placed before the jury by direct examination of the witness."[23] The Court **ORDERS** the government to comply with Federal Rule of Criminal Procedure 16 no later than seven days before trial, and to continue to comply with the deadlines regarding trial exhibits, as set forth in the Court's scheduling order.

### D.     Prosecution or Investigation Agency Reports and Writings Prepared by Prosecuting Attorneys

Camacho requests "[a]ny prosecution report or investigation agency report which shows what the witness observed or did at the time in question and which

---

[23] Doc. No. 60 at 1.

concerns facts testified to by the witness on direct examination, whether made by the witness or not, so long as the witness has adopted the same as being correct."[24] Camacho also requests "[a]ny writing prepared by prosecuting attorneys relating to the subject matter of the testimony of a government witness, and such writing being signed or otherwise adopted or approved by said witness during his testimony."[25] After witnesses have been called and have testified, the Court **ORDERS** the government to fulfill its obligations under the Jencks Act, 18 U.S.C. § 3500(b).[26]

### E. Presentation of Statements, Documents, and Charts to the Jury

Camacho requests that the United States prove the admissibility of statements, documents, and charts before presenting them to the jury and outside the presence of the jury. This request is unripe. Camacho may file a motion in limine or object at trial to any materials that he believes would unjustly prejudice the jury against him. So his request is **DENIED WITHOUT PREJUDICE**.

### F. "Government Tenders"

Camacho requests that any statements, documents, or charts be referred to as "government tenders" in front of the jury and that their contents not be revealed to the jury. At this stage, it is too early to decide if such a request is reasonable. The Court does not know what the statements, documents, or charts will be and if some of them will be admissible—meaning that their contents can be revealed to the jury.

---

[24] Doc. No. 60 at 1.

[25] *Id.*

[26] *See also United States v. Brown*, 303 F.3d 582, 591–92 (5th Cir. 2002) (explaining requirements of the Jencks Act).

If and when Camacho files a motion in limine or objects at trial, he can re-urge this request and the Court will consider it on an item-by-item basis. For now, this request is **DENIED WITHOUT PREJUDICE**.

### IV.     Motion to Prohibit

Camacho requests that the Court instruct the government to refrain from mentioning in the presence of the jury his extrinsic offenses or other acts of misconduct without first approaching the bench and obtaining a ruling from the Court as to admissibility. The government agrees to comply with Camacho's requested approach. [Doc. No. 66 at 16.] The Court **GRANTS** Camacho's motion to prohibit.

### V.     Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Camacho's motion to suppress, **GRANTS IN PART** and **DENIES IN PART** his motion to obtain, and **GRANTS** his motion to prohibit.

**IT IS SO ORDERED** this 30th day of November, 2021.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE